UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| FAYE STRAIN, as Gaurdian of ) <br> THOMAS BENJAMIN PRATT, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> VIC REGALADO, in his official capacity, ) <br> BOARD OF TULSA COUNTY ) <br> COMMISSIONERS OF TULSA COUNTY, ) <br> ARMOR CORRECTIONAL HEALTH ) <br> SERVICES, INC., ) <br> CURTIS MCELROY, D.O., ) <br> PATRICIA DEANE, LPN, and ) <br> KATHY LOEHR, LPC, ) <br> ) <br> Defendants. ) | Case No. 17-CV-0488-CVE-FHM |

## OPINION AND ORDER

Now before the court are motions to dismiss filed by all defendants: Armor Correctional Health Services (Armor) (Dkt. # 14); Patricia Deane, LPN (Dkt. # 15); Kathy Loehr, LPC (Dkt. # 16); Curtis McElroy, D.O. (Dkt. # 17); and Vic Regalado and the Board of County Commissioners (BOCC) of Tulsa County (Dkt. # 21).

**I.**

Plaintiff Faye Strain is the duly appointed guardian, and mother, of Thomas Benjamin Pratt. Dkt. # 2, at 1. In her complaint (Dkt. #2), plaintiff alleges the following: on December 11, 2015, Pratt was booked into the David L. Moss Criminal Justice Center, often referred to as the Tulsa County Jail (the Jail). Id. at 5.

On December 12, 2015, at 7:39 a.m., Pratt submitted a medical sick call note requesting to speak to a nurse about "detox meds." Id. Later that day, at 12:10 p.m., Pratt submitted a second sick call note, stating,

> MY NAME IS TOMMY PRATT I CAME IN YESTERDAY AND STARTED HAVING WITHDRAWLS [sic] I NEED TO TRY AND GET SOME DETOX MEDS
> THANKYOU [sic]

Id. At 1:05 p.m., a nurse and employee of defendant Armor—a private corporation responsible, in part, for providing medical and mental health services to Pratt while he was in custody of the Tulsa County Sheriff's Office (TCSO)—conducted a drug and alcohol assessment of Pratt. Id. Pratt advised the nurse that he had a habit of drinking fifteen-to-twenty beers a day for at least the previous ten years. Id. The assessment tool indicates that Pratt was experiencing constant nausea, frequent dry heaves and vomiting, moderate tremors, anxiety, restlessness, drenching sweats, and severe, diffuse aching of the joints and muscles. Id. at 5-6. Accordingly, Pratt was placed on a "Librium protocol" (a sedative tranquilizer frequently used for patients experiencing alcohol withdrawal) and "seizure precautions" were ordered. Id. at 6. At 1:48 p.m., Pratt was admitted to the Jail's medical unit, where a different nurse conducted a "mental health infirmary admission assessment." Id. The nurse noted that Pratt was nauseated, slumped over, anxious, fearful, and "unsteady on his feet," and that he was a "risk for injury" due to his detoxification and "high blood pressure." Id.

On December 13, 2015, Pratt was again placed on seizure precautions, which included an order that his vital signs be taken every eight hours. Id.[1]

---

[1] This order, however, was not complied with. Id. at 8.

On December 14, 2015, at approximately 2:08 a.m., defendant Patricia Deane, LPN, conducted another drug and alcohol assessment of Pratt. Id. The assessment tool indicated that he was experiencing constant nausea, frequent dry heaves and vomiting, severe tremors even with arms not extended, acute panic states as seen in severe delirium or acute schizophrenic reactions, restlessness, drenching sweats, continuous hallucinations, and disorientation for place or person. Id. at 6-7. Later that day, a nurse practitioner gave a phone order to start a Valium protocol. Id. at 7. At 3:44 p.m., an unidentified Armor employee took Pratt's vital signs and noted that he was "tearing up" his cell and stating that he was "locked in the store." Id.

In a note dated December 14, 2015, and placed in the Armor medical chart, defendant Curtis McElroy, D.O., stated,

> Pt seen and evaluated. Came in 12/11/15 with alcohol abuse and placed on Librium protocol for the alcohol withdrawal. Pt switched to [V]alium and received first dose this morning. Pt reported to be found on floor pulling up tile with approximately 2 cm forehead laceration. Small, < 1 cm laceration left lateral elbow area and a laceration < 1cm on right mid right posterior forearm. Some scratches on dorsum of nose. No other facial injury. Pt awake, confused, talking about what movie are we watching tonight. No history of witnessed fall or pt inflicting injury to himself. Pool of blood under sink in cell.

Id. at 8-9.[2]

On December 15, 2015, defendant Kathy Loehr, LPC, conducted an initial mental health evaluation of Pratt. Id. Loehr observed that he was making slow, shaky movements, and presented with a wound on his forehead from an apparently unintentional, self-inflicted injury sustained on December 14. Id. at 11. Loehr was unable to complete her evaluation, however, because Pratt had

---

[2] Also on December 14, 2015, a nurse reported that Pratt was angry, anxious, confused, reaching into space, had impaired short term memory, and needed assistance with activities of daily living. Id. at 10.

difficulty answering questions. Id. Later that afternoon, at 3:40 p.m., McElroy logged a second note in the Armor medical chart, stating that Pratt was reported to "have been found underneath sink [in his cell] with laceration [on] mid-forehead." Id.

On December 16, 2016, at approximately 12:00 a.m., a nurse observed that Pratt "would not get up." Id. at 12. Just before 1:00 a.m., a detention officer noticed him lying on his bed and not moving; the detention officer called for a nurse. Id. at 12. Upon entering Pratt's cell, the nurse found that he had no pulse or respiration and was completely unresponsive. Id. She initiated CPR and called a medical emergency at around 1:00 a.m. Id. Shortly thereafter, first responders arrived; Pratt was resuscitated at around 1:15 a.m. and was rushed to St. John Medical Center in Tulsa, Oklahoma. Id.

According to the Emergency Medical Services Authority (EMSA) report, Pratt had suffered a cardiac arrest. Id. The EMSA report also stated that: the Jail medical staff reported that Pratt hit his head "four days ago" and has been non-verbal and lethargic ever since; Pratt has been going through withdrawals and been on suicide watch; and he had a large hematoma to his forehead from his fall "four days ago." Id. at 12-13.

Pratt was admitted to the hospital, where he remained until January 1, 2016. Id. Upon discharge, he was diagnosed with cardiopulmonary arrest secondary to presumed seizure during incarceration, acute renal failure secondary to hypotension and rhabdomyolysis, Todd's paralysis, agitation, anoxic brain injury, AKI secondary to hypotension and rhabdomyolysis, hyponatremia, acute transaminitis, and acute head laceration. Id. at 13.

Before Pratt was admitted to the Jail on December 11, 2015, he had no history of seizure disorder, brain damage, or severe mood swings. Id. Since suffering cardiac arrest at the Jail, he has

become permanently disabled. Id. He continues to suffer from severe seizure disorder, memory loss, extreme mood swings and anger, and communication deficits and delays. Id. He is now unable to work, and lives with his parents. Id. He requires assistance with everyday life activities and is incapable of safely living on his own. Id.

Plaintiff alleges that, at the Jail, there are longstanding, systemic deficiencies in medical and mental health care services, about which Former Sheriff Stanley Glanz knew. Id. at 14. Plaintiff also alleges: in 2007, the National Commission on Correctional Health Care (NCCHC) audited the Jail and concluded that there were numerous deficiencies in the care provided to inmates, including failure to address health care needs in a timely manner. Id. In 2009, the Oklahoma State Department of Health cited TCSO for a violation of the Oklahoma Jail Standards in connection with the suicide death of a schizophrenic inmate. Id. at 15. In August 2009, the American Correctional Association conducted a mock audit of the Jail, which revealed that it was non-compliant with mandatory health standards. Id. In response to the audit, Elizabeth Gondles, Ph. D., produced a report to identify issues and suggest improvements. Id. The issues Gondles identified included: under-staffing of medical personnel; deficiencies in doctor/PA coverage; lack of health services oversight and supervision; failure to provide new health staff with formal training; failure to provide timely health appraisals to inmates; and 313 health-related grievances within the twelve months before the report was written. Id. at 16. Gondles concluded that these issues were a result of the "lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private provider." Id. To address these issues, Gondles "strongly suggested" that the Jail establish

a "central Office Bureau of Health Services," to be staffed by a "TCSO-employed Health Services Director." Id. TCSO, however, did not implement Gondles's recommendations. Id.[3]

Plaintiff further alleges that, in 2010, the NCCHC conducted a second audit of the Jail's health system, after which the NCCHC placed the Jail on probation. Id. at 17. The NCCHC found numerous deficiencies with the Jail's health services program, including: the quality assurance multi-disciplinary committee does not identify problems, implement and monitor corrective action, "nor study its effectiveness;" there were several inmate deaths in the previous year; the clinical mortality reviews were poorly performed; the responsible physician does not document his review of the registered nurse's health assessment, or conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff; diagnostic tests and speciality consultations are not completed in a timely manner and are not ordered by the physician; if changes are indicated, the changes are not implemented; when a patient returns from an emergency room, the physician does not see the patient, review the discharge orders, or issue follow-up orders as clinically needed; potentially suicidal inmates are not checked regularly, and follow-up with them has been poor; and training for custody staff has been limited. Id. Sheriff Glanz read only

---

[3] Plaintiff's complaint alleges further that, on October 28, 2010, Assistant District Attorney Andrea Wyrick wrote an email to TSCO's Risk Manager voicing concerns about whether the "Jail's medical provider, [...] CHMO, a subsidiary of CHC, was complying with its contract." Id. In addition, plaintiff's complaint alleges that Ms. Wyrick stated, "This is very serious, especially in light of the three cases we have now—what else will be coming? It is one thing to say we have a contract . . . to cover medical services . . . . It is another issue to ignore any and all signs we receive of possible [medical] issues . . . ." Id. "CHMO," however, is not a defendant in this case, and plaintiff fails to explain what CHMO or CHC are. These facts lead the Court to believe that this portion of plaintiff's complaint is unrelated to these defendants.

the first two or three pages of the report and is unaware of any policies or practices changing at the Jail in response to it. Id. at 18.

Additional historical allegations include: that over a period of many years, Tammy Harrington, R.N., former director of nursing at the Jail, observed and documented deficiencies in the delivery of health care services to inmates, including chronic failure to triage inmates' requests for medical and mental health assistance, chronic lack of supervision of clinical staff, and repeated failures of medical staff to alleviate known and significant deficiencies in the health services program. Id. On September 29, 2011, the United States Department of Homeland Security's Office of Civil Rights and Civil Liberties reported its findings in connection with an audit of the Jail's medical system pertaining to the United States Immigration and Customs Enforcement detainees, which found numerous deficiencies. Id. After the report was issued, Harrington did not observe any meaningful changes in health care policies or practices at the Jail. Id. On October 27, 2011, an inmate died at the Jail as a result of "inhumane treatment and medical neglect." Id. A federal jury has since entered a verdict holding Sheriff Regaldo liable in his official capacity for the unconstitutional treatment of this inmate. Id. at 19. In the wake of this inmate's death, Sherrif Glanz made no meaningful improvement to the Jail's medical system. Id. And, just months after this inmate died, another inmate died due to "deficient care." Id. On November 18, 2011, the Jail's retained medical auditor issued a report to former Sheriff Glanz, finding multiple deficiencies with the Jail's medical delivery system, including documented deviations from protocols which increase the potential for preventable morbidity and mortality. Id. The auditor noted six inmate deaths, finding deficiencies in the care provided to each. Id. As part of a 2012 corrective action review, the auditor found: delays for medical staff and providers to get access to inmates; no sense of urgency

in attitude to see patients, or have patients seen by providers; failure to follow NCCHC guidelines to get patients to providers; and not enough training or supervision of nursing staff. Id. at 20. In November 2013, BOCC retained Armor as the new private medical provider for the Jail. Id.

On August 25, 2017, plaintiff filed her complaint (Dkt. # 2), alleging that: (1) all defendants, (including Sheriff Regalado in his official capacity, and ARMOR under a theory of municipal liability), pursuant to 42 U.S.C. § 1983, violated Pratt's Eighth Amendment right to be free from cruel and unusual punishment (count one); (2) defendants Armor, McElroy, Deane, and Loehr are liable in common-law negligence for failing to provide Pratt adequate care (count two); and (3) all defendants violated Pratt's right to be free from cruel and unusual punishment under Article II § 9 of the Constitution of the State of Oklahoma (count three). Id. at 20-26. Plaintiff seeks actual and punitive damages. Id. at 26.

## II.

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its face" and the factual allegations "must be enough to raise a right to relief above the speculative level." Id. (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 562. Although decided within an antitrust context, Twombly "expounded the pleading standard for all civil actions." Ashcroft v. Iqbal, 556 U.S. 662, 683 (2009). For the purpose of making the dismissal

determination, a court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to a claimant. Twombly, 550 U.S. at 555; Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007); Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1231 (10th Cir. 2002). However, a court need not accept as true those allegations that are conclusory in nature. Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs, 263 F.3d 1151, 1154-55 (10th Cir. 2001). "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir. 1991).

In addition, where "a § 1983 plaintiff includes a government agency and a number of government actors sued in their individual capacities, it is particularly important . . . that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice [under Twombly and Federal Rule of Civil Procedure 8(a)(2)] as to the basis of the claims against him or her, as distinguished from collective allegations against the state." Bark v. Chacon, 504 Fed. App'x 741, 745 (10th Cir. 2012)[4] (quoting Robbins v. Oklahoma, 519 F.3d 1242, 1249-50 (10th Cir. 2008)). "When a plaintiff instead uses 'either the collective term 'Defendants' or a list of defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed.'" Id. (quoting Robbins, 519 F.3d at 1250).

---

[4] This and other cited unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

**III.**

Count one of plaintiff's complaint alleges that all defendants deprived Pratt of his Eighth Amendment right to be free from cruel and unusual punishment, as their deliberate indifference to his medical needs caused the permanent disabilities from which he now suffers. Dkt. # 2, at 21. In their motions to dismiss, each defendant responds that plaintiff's complaint fails to state a claim for an Eighth Amendment violation. Dkts. ## 14, at 9; 15, at 9; 16, at 9; 17, at 9; 21, at 15.

"'Deliberate indifference to serious medical needs of prisoners' violates the Eighth Amendment.'" Redmond v. Crowther, __F.3d__,__, 2018 WL 798283, at *6 (10th Cir. Feb. 9, 2018) (quoting Estelle v. Gamble, 429 U.S. 97, 104-05 (1976)). "To establish an Eight Amendment claim based on inadequate medical care, the prisoner must prove both an objective component and a subjective component." Id. (citing Self v. Crum, 439 F.3d 1227, 1230-31 (10th Cir. 2006)). "The objective component requires showing the alleged injury is 'sufficiently serious.'" Id. (citing Crum, 439 F.3d at 1230). "A delay in medical care is only sufficiently serious if the plaintiff can show the delay resulted in substantial harm." Id. (citing Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005)). "A 'lifelong handicap, permanent loss, or considerable pain may satisfy the substantial harm requirement.'" Id. (quoting Mata, 427 F.3d at 751). "The subjective component requires showing the prison official 'knew [the inmate] faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it.'" Id. at *7 (quoting Martinez v. Beggs, 563 F.3d 1082, 1088-89 (10th Cir. 2009)). "The subjective prong is met if prison officials intentionally deny[] or delay[] access to medical care or intentionally interfere[] with the treatment once prescribed." Id. (internal quotation omitted).

As an initial matter, count one of plaintiff's complaint is drafted in precisely the fashion Robbins proscribes; i.e. it is a § 1983 claim against a government agency and a number of individual government actors—referred to collectively as "defendants"—that fails to specify who is alleged to have done what to whom. Dkt. # 2, at 21-22. Under Robbins, therefore, count one of plaintiff's complaint fails to provide the individual defendants with fair notice as to the basis of the claim against them, to which they are entitled under Fed. R. Civ. P. 8(a)(2). Moreover, even assuming, arguendo, that count one of plaintiff's complaint does provide fair notice to defendants, it nevertheless fails to state a claim for an Eighth Amendment violation because it does not allege that any defendant disregarded a risk to Pratt, intentionally denied or delayed his access to medical care, or interfered with his treatment once it was prescribed.[5]

Accordingly, plaintiff's Eighth Amendment claim (count one) must be **dismissed** as against all defendants.

### IV.

Plaintiff's remaining claims for common-law negligence against Armor, McElroy, Deane, and Loehr (count two), and violation of Article II § 9 of the Constitution of the State of Oklahoma against all defendants (count three), arise under state law. Pursuant to 28 U.S.C. § 1367(a), federal courts may exercise supplemental jurisdiction over claims related to claims over which it has original jurisdiction. A district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); see Gaston v. Ploeger, 297 F. App'x 738, 746 (10th Cir. 2008) (stating that § 1367(c)(3) expressly permits a

---

[5] Rather, plaintiff's complaint alleges only, in conclusory fashion, that defendants failed to "provide adequate medical care" to Pratt. Id. at 21.

11

district court to decline to exercise supplemental jurisdiction over remaining state law claims after granting summary judgment in favor of defendant on federal law claims). This Court does not have original jurisdiction over plaintiff's common-law negligence or Oklahoma constitutional claim because they arise under state law, and there is no evidence that diversity jurisdiction is present.

The decision to exercise supplemental jurisdiction is discretionary, but courts should consider "the nature and extent of pretrial proceedings, judicial economy, convenience, and [whether] fairness would be served by retaining jurisdiction." Anglemyer v. Hamilton Cnty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995) (quoting Thatcher Enters. v. Cache Cnty. Corp., 902 F.2d 1472, 1478 (10th Cir. 1990)). The Court finds that the extent of the pretrial proceedings does not outweigh the interests that would be served by having plaintiff's state law claims tried in a state court. Judicial economy would be served by having the Oklahoma courts resolve issues of Oklahoma law, and the parties have an interest in having their Oklahoma law disputes decided in a court intimately familiar with that law. Further, the Tenth Circuit has "repeatedly recognized that this is the preferred practice." Gaston, 297 F. App'x at 746; see also Smith v. City of Enid, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state law claims."). The Court, therefore, declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims.

**IT IS THEREFORE ORDERED**, that all defendants' motions to dismiss—Armor Correctional Health Services (Dkt. # 14); Patricia Deane, LPN (Dkt. # 15); Kathy Loehr, LPC (Dkt. # 16); Curtis McElroy, D.O. (Dkt. # 17); and Vic Regalado and the Board of County Commissioners of Tulsa County (Dkt. # 21)—are **granted**.

**DATED** this 1st day of March, 2018.

_Claire V. Eagan_
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE